I would like to start by addressing the claim of ineffective assistance of counsel at the penalty phase, the claim on respondent's cross-appeal, beginning with the absence of any Supreme Court authority addressing three important factors that are issued in this case. First, a petitioner who interferes with counsel's investigation of his family background. Second, a petitioner who even after having received a death sentence and in a post-conviction setting refuses to discuss the details of, or in some instances even admit, the most mitigating aspects of his background, that here being the abusive prison conditions. And three, where the petitioner then, despite that, does not present any evidence establishing that he would have allowed counsel to present the evidence that he later claims should have been presented. And here, although the objection at the time of trial did not expressly extend to prison conditions, the reason for that is that the issue simply did not come up at the time of trial, so there was nothing for petitioner to object to. So help me for a minute with where we are in this habeas review. We're under AEDPA, is that correct? Correct. So we're looking at the opinion of the California Supreme Court. Correct. Correct? And the question for us is whether that opinion was an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts, correct? Correct. But a threshold issue that the Supreme Court and this Court have both identified is whether or not at the very outset there is any Supreme Court authority clearly dictating how a case should be resolved. And in the Landrigan case... Well, there certainly are Supreme Court cases about what an attorney has to do to be effective, correct? I mean, beginning with Strickland. In general, that is true. However, despite Strickland and despite other cases applying Strickland, the Supreme Court found in Landrigan that a different situation is presented when there's an interfering defendant, and that it had never addressed a situation with an interfering defendant, and because of that, there was no clearly established law in terms of those kinds of situations that would have dictated the result of that kind of a case. And because of that, since we have a comparable situation here, despite Strickland, it's simply too broad of a case to dictate what is supposed to happen when you have a defendant who interferes at the time of trial with an avenue of mitigation, that even after receiving the death sentence and having an opportunity to discuss it and make that part of his record, refuses to talk about it, refuses to admit important details, and then presents no evidence that he would have allowed counsel to present it. But what about Williams v. Taylor? In Williams v. Taylor, counsel failed to investigate his childhood only because they incorrectly believed that state law did not allow that to happen. And adamantly opposed them continuing down that path of investigation and went so far as to threaten to disrupt the trial if counsel continued to do that. And Miller's uncontradicted testimony at the evidentiary hearing was that petitioner not only objected to his mother, but he simply didn't want his family dragged into the case. He didn't want them contacted. He didn't want them involved. There was other evidence, though, right? The referee said they could, using standard techniques, I guess standard at the time of the referee hearing, they could have gathered information about his mental state. They could have gathered prison records and learned about the situation at Matt Miggs and the like. There are two other areas of mitigation. However, the California Supreme Court reasonably found that counsel performed adequately with respect to those two areas. As to the prison conditions, the court found that counsel was not unnoticed to investigate the conditions of confinement because petitioner did not disclose them. In addition to that... Well, but just a minute. What about Carl Popolis? I mean, if not only was he at Mount Miggs, counsel tried to contact him on multiple occasions, even after the penalty phase. He lived in L.A. There's even evidence that Andrew requested they find Popolis. Wasn't it reasonable then for effective counsel to have contacted him? But Miller specifically testified that the reason for contacting Popolis was with respect to the guilt phase regarding impeachment evidence against Carol Brooks because they all knew each other. There is no evidence from Mr. Miller and Andrews did not testify to the effect that he pointed his attorneys to Mr. Popolis for any kind of potential mitigating evidence at the penalty phase. And so the California Supreme Court found counsel was not unnoticed. Well, I thought there was evidence in the record, and I quote, Counsel instructed the investigator to check out all angles on Popolis. And there's also testimony... Popolis then was a known avenue investigation, and it seems to me there's nothing in there to suggest a strategic reason not to follow up. The problem with that is that the attorney testified and the investigators and petitioner has even argued that those investigators were limited to the guilt phase. Their role was limited to that phase of the trial. They were not involved in investigating the penalty phase of the trial. So when in context, when counsel says to go ahead and investigate Popolis as to all areas, that's in the car to yes, to investigate him as to all areas. That's in the context of the guilt phase of the trial, not the penalty phase. Well, I guess it's my worry with Popolis being the way to get to St. Migs without going through the family so that we destroy your argument as it relates to not going to the family, that it seems to me that going there and doing something about that would have been an absolutely good thing to do. But they had no reason to know or suspect that Popolis would have had any additional information about the penalty phase. There was nothing that counsel had, no triggering information that would have prompted an attorney or raised any red flags about the prison conditions at issue in this case. They even went and reviewed the prior conviction files in Mobile, Alabama, and nothing there reflected what the conditions of confinement were like in Alabama 15 or so years earlier. You agree with me that if counsel were aware of the St. Migs evidence, they would have presented it? Not necessarily, because as Mr. Miller said... Pretty bad evidence, pretty good mitigating evidence for the defendant. And if they'd have been aware of it, it seems to me they'd have presented it. If we're looking right now at only the Mt. Meigs evidence, perhaps, theoretically, counsel may have sought to present that separately, but that is not the claim that petitioner presented to the California Supreme Court. His claim was that all of this evidence, Mt. Meigs, the Mobile County Jail, and all of the Alabama prison conditions, as well as family background and mental health, that is his claim. Everything had to be presented. So the California Supreme Court didn't consider a claim that was limited to the Mt. Meigs evidence. Well, it's one of the many claims they made. We could go through each one and look at it, and you've addressed mental health. That's why I wanted you to look at Mt. Meigs. I mean, it seems to me that if I look at what Miller says, he says that he would have presented evidence of racially motivated conditions. That's exactly what Mt. Meigs is. So we're really stuck again back with Karl Popolis. If we eliminate that you can't go through the mother or the family who knew about it, then Karl Popolis is in fact it, right? Only if counsel had some reason to believe that Popolis had. We knew Popolis was down there with him, didn't he? He knew that he knew him. I don't know if he knew that they were incarcerated together. And even still, Popolis did not reveal anything to counsel. Andrews did not reveal anything to counsel. There wasn't anything that counsel had that would have triggered them to investigate the prison conditions separate and apart from the prior convictions in and of themselves. And there's no per se rule that would have required counsel to do that. Petitioner has not pointed to any authority, testimony, or evidence establishing that the prevailing professional norms in 1984 required counsel, as a matter of course, to investigate the prior conditions of confinement for prior convictions. Well, let's go ahead. Sorry. So the Supreme Court decisions that were clearly established at the time the California Supreme Court decided that was, I guess, Berger and Bell along with Williams. So in Berger and Bell, there was no presentation, no investigation. There was a strategic determination, or the Supreme Court said the lawyers could have strategically determined not to bring this mitigating evidence. My colleague here says that there wasn't any strategic reason for not going into Mount Meigs. Would the California Supreme Court be unreasonable in concluding there was a strategic reason? The court did find that counsel had concerns about digging through his prior conduct in prison because it could reflect perhaps good acts but also bad acts. Well, here's the problem. If I look at this record, it's hard for me to determine that counsel had any strategy at all. So if I come up with strategy, I've got to come up with something the California Supreme Court in my book invented. Frankly, is it reasonable under Supreme Court precedent for the California Supreme Court to invent some strategic reasons after the fact for what counsel did? It's not a matter of inventing strategic reasons. The lead attorney in this case had passed away by the time of the evidentiary hearing. So there was no testimony from lead counsel about what his strategy was. And in light of that, the presumption of competence to everything he did applies. And moreover, the court did look at his closing argument to try to detect what his strategy was. That is the same approach that the Supreme Court took in Pinholster. So there's nothing unreasonable about trying to gauge what counsel's strategy was by looking at the closing argument. And in addition to that, the court has said that in a case like that where you don't have the reasons on the record, the court is required to entertain all the possible strategic reasons that counsel might have had for acting as they did. And that is what the California Supreme Court did, reasonably so, in conformity with U.S. Supreme Court cases in this case. The same is true for the mental health evidence. There is no, there was nothing before counsel that should have prompted a mental health investigation. The referee, the district court, and the California Supreme Court all agreed about that. Miller was asked about a 10 or so year old motion to continue one of Petitioner's prior conviction cases on the basis of a possible investigation for insanity. But as he also testified, nothing ever came of that. There was no insanity issue presented. There were no reports. And so in light of counsel's interactions with Petitioner himself, that would not have been enough to trigger a mental health investigation for the mitigating phase of the case. And if I'm to understand it correctly, counsel suggested there was nothing in his mental health would have prompted him to do anything, and there were no records of any mental health problems otherwise? They did not present any reports of mental health issues that the Petitioner may or may not have had. And as it turned out, when he was evaluated later, there was no truly mitigating mental health issue that came of that testimony. Because his experts had performed all manner of tests that were not done properly. His mother did tell him, didn't she, that he was a slow learner? She did say that, but that by itself does not indicate a mental health mitigating case. And in fact, Petitioner's IQ turns out to be 93, which is in the average range. And so that by itself, notwithstanding, and counsel had been talking to Petitioner on a regular basis, they're interacting with him, they're dealing with him, they're talking to him. If they have no reason to suspect, based on their numerous conversations with him, that there's any genuine mental health issue to be investigated, they're not obligated to do that. And even Attorney Goldstein, in the post-conviction setting, said she did not detect any mental health issues, but would have investigated it anyway, just as a matter of course. But that's not what the case law requires. Even despite his criminal history, I mean, they knew his extensive criminal history and the nature of his criminal history, and then that he was in a juvenile, that he ran into trouble really early on. Nothing of that presents that above what you call the normal sort of level or need to investigate. I don't think that the mere fact that a defendant has committed prior criminal acts or has prior convictions necessarily demonstrates that he has a mental health issue. Well, not just any, but the kind that he did here. I mean, he was apparently involved in a robbery that resulted in murder. They knew that there was evidence. They said he was a follower. He had other crimes, and he had this whole history of being abandoned as a kid. That is not something that was disclosed to counsel, however, and he wasn't truly abandoned. He was left with his grandparents in a home full of family members and adults and other children, and that family raised him. The mother did leave to go to Detroit, but he was not abandoned and left in foster care or anything of that nature. And even in addition to all of that, the California Supreme Court reasonably concluded that there was no prejudice when considering all of the mitigating evidence and all of the aggravating evidence. While the prison conditions in Alabama were absolutely terrible and would have engendered some sympathy, that is not the end of the inquiry. The California Supreme Court reasonably found, based on three factors, that there was no prejudice in the end because, number one, of the circumstances of the crime, number two, the double-edged nature of the mitigating evidence, and number three, the substantially damaging rebuttal evidence that would have been admitted in response. Well, there really isn't any rebuttal evidence to admit as it relates to St. Migs, is there? As to Mt. Migs, again... Sorry, Mt. Migs. That wasn't... That was joyriding. It was car theft, and even if we were to hypothesize... Wasn't anything there that would be bad for him to let in about Mt. Migs? Again, that wasn't just his claim, but even if we were to hypothesize that counsel could have presented evidence, and if he had presented a claim, that the Mt. Migs evidence by itself could have been presented, that was only from the ages of 14 to 16, and yes, what occurred there was terrible, but that would then leave a 15-year gap during which counsel would then not be able to point to anything else, and even Petitioner's expert and Petitioner in his brief has admitted that after Mt. Migs, Petitioner's moral sense would not accept murder. In light of that... Well, if I look at Rompilla and I look at prejudice, it says in there, although we suppose that a jury could have heard it all and still have decided the death penalty, that's not the test. It goes without saying that the undiscovered mitigating evidence taken as a whole might well have influenced the jury's appraisal of the defendant's culpability. Throwing Mt. Migs into the hole, be it may, this was when he was young. That evidence is terrible. It is terrible. The jury didn't get a chance to look at it at all. That is true, but it would not explain the three horrendous murders that Petitioner committed in this case. He tortured the first victim. He slashed him about the face. He stabbed him six times in the chest and then fatally shot him in the neck. He violently raped 19-year-old Brandon. So the prosecutor didn't go into all this at the penalty phase, right? The prosecutor showed the photos of the victims and the evidence of the prior convictions but didn't go into what happened after he got out of the Mt. Migs. He committed another crime that resulted in a felony murder and shot at the taxi driver and all the rest of that evidence. So the California Supreme Court said, well, there was a lot of rebuttal evidence that would have come in had he opened the door. And so why is that not a reasonable conclusion or reasonable application of the Supreme Court president to say in light of that consideration? It is a reasonable application in light of all of that. The court did find, although the jurors were aware of the prior convictions themselves, they did not know the details. So in addition to the circumstances of the crime, the jurors would have learned about all this additional aggravating rebuttal evidence and damaging cross-examination that would have occurred, which includes learning about petitioners shooting at Waddall several times and nearly shooting him in the head as they fled from the Warhurst robbery murder, that he held two women hostages in a separate attempt to rob a laundromat and grasped a young woman around the neck and pointed a cocked loaded gun at her head and threatened to shoot her or the police. All this new information would have come out. Petitioners' experts would have been vigorously cross-examined and forced to testify, just like the state hearing, in excruciating detail about the horrendous circumstances of this case, the prior robbery murder, petitioners' escapes, domestic violence against Annise Henderson, domestic violence against Angela Mason, an attempt to escape, and a threat to kill another inmate. But yet no reason to look into his mental health. This is the aggravating rebuttal evidence that came out. No, but this is what their lawyers knew about him. They didn't know the details of all the prior convictions except for the shooting at Waddall. But they didn't know all of the information that came out later, and there is no Supreme Court case that says a petitioner's prior criminal history in and of itself in every case gives rise to a constitutional obligation to search for mental health evidence at the mitigating phase. If that was the case, just about every death penalty case would require a mental health expert, and the Court has never said that. No, I understand that, but you emphasize the heinous nature of this crime and then the heinous nature of the other crime that the lawyers knew about, and I'm just trying to figure out if that distinguishes this case from others. I don't believe that it does in terms of investigating potential mental health. In fact, in this case, another thing that the jurors would have learned about was the prosecution diagnosing him as a sociopath and his own experts having to admit that he met the diagnostic criteria for that. That is not mitigating. That's actually aggravating, or at least would have been argued that way to the jurors in this case. And so even if they had investigated that, the response would have been, well, all this can simply be attributed to the fact that the defendant is an antisocial personality or a sociopath as opposed to any other kind of mitigating mental health problem. And so there is a major double-edged nature to pursuing a mental health defense in this kind of a case, and it would certainly be aggravating for the prosecutor to argue to the jurors that he was simply a violent criminal for all of his life, spent most of his time in prison, rudderily resorted to crime every time he was released, and all of these violent crimes are simply attributable to the fact that he is a sociopath. So even though this evidence was not presented at the penalty phase, considering all of the substantially aggravating rebuttal evidence that would have been admitted, and in addition to what I've mentioned so far, there's also two stabbings that Petitioner committed in prison, and all of it taken together could simply have reinforced for the jurors that Petitioner, through the testimony of all these hardened criminals, that he was simply another hardened criminal who was desensitized to violence. So we're really looking at whether the California Supreme Court was unreasonable in so concluding, right? Because we're under the EDPA doubly deferential standard for a Strickland claim. Absolutely correct. There either has to be a Supreme Court case that clearly dictated and mandated that court to find that in view of all this evidence, there was nothing but, that nothing could have possibly occurred but a finding of prejudice, and there is no Supreme Court case that accounts for this kind of evidence on both sides, and that's only if we go beyond the threshold question about whether or not the special circumstances of this case regarding the interference and no triggering information about the prisons would have, would allow the analysis to go beyond that threshold question in the first place. But even if so, viewing all of this evidence together, as of 2002, there was no Supreme Court case that required, absolutely required, the California Supreme Court to find that there was prejudice. So what they did in finding no prejudice was reasonable under Supreme Court holdings. Do you want to save the rest of your time? Yes, please. Thank you. Good afternoon. My name is Michael Bird. I represent Petitioner Jesse Anders, and I'd like to begin by pointing out that under California law, death penalty law, as in many states, jurors are tasked with making this life or death decision based not only on the capital of crime but on the personal characteristics, background, and other factors relating to the personal history of the person being charged with a capital offense. And in this case, the jury didn't have the opportunity to perform that function because counsel simply did not do their jobs. So we're looking at whether the California Supreme Court unreasonably applied Supreme Court precedent Yes. in saying that the lawyers were not deficient. So we need to identify what the Supreme Court precedent is that the California Supreme Court unreasonably applied. And at the time of the decision, we're looking at Berger, Bell, and Williams is my understanding. Yes. Those are the three cases that were decided as of the time 2002 when the California Supreme Court decided this case. The case law, though, does indicate that it's reasonable to look at post-state court decisions because the post-Adepa Strickland decisions, none of them create new law. Wiggins, for instance, applied the Williams case. Supreme Court applied Williams and Wiggins, right? Right. So that adds to your argument that you can apply post-dated Supreme Court decisions in making this determination. Yes. And there seems to be precedent out there, circuit precedent, which indicates that that methodology is proper because the other cases, Rompilla, Sears, all those cases are in line with Strickland, create no new rules. What evidence is there in the record detailing what the professional standards were for defense counsel in death penalty cases in 1984? There were three separate, actually four separate Strickland experts presented. There was testimony by an attorney expert. So we're talking only about the attorneys? There's nothing about professional standards themselves? Because what I'm looking at is the California Supreme Court effectively looked at what happened here and said based on the evidence in this record, it felt like the professional standards for death penalty were upheld. And I looked, because I looked at all the cases, I looked at Wiggins, I looked at Williams, and I looked at Rompilla, where Rompilla used ABA standards. Yes. And so I'm saying to myself, what evidence was there in the record detailing what the professional standards were? Do I only look at the experts? Are they the ones that are going to tell me that? Well, the experts, I think, reference the standards, but I think the Supreme Court cases Well, I don't think the experts were very good at even telling me what the standards were. And the experts aside, I think that the cases rely on the ABA standards, which were in existence as of 1980. Yeah, but nobody presented that to the California Supreme Court. I'm trying to figure out why the California Supreme Court's decision on this is not reasonable. I'm looking at what's in the record so that I can determine what they can look at and what they've got in front of them. I couldn't find anything that was presented to them about certain standards that this council was to have applied in that year, in 1984. Well, I think the case is unusual to the extent that we did address the issue of standards through the Strickland experts. In other words, there were attorneys who practiced in that jurisdiction. If I only look at the Strickland experts, I'm going to tell you I don't think there was a standard established. Well, there certainly, it's our view, was the basic duty of investigation is set forth in Strickland was well established. And I don't think the California Well, I can go with Strickland standard because that's a pretty easy standard to apply. And then when I look at the California Supreme Court, they would know better what California lawyers are supposed to do than I would. I'm, after all, just an Idaho yahoo. So I look at them and I have to give them reasonable deference for whether they think there was a professional standard violated. And the problem with the analysis by the California Supreme Court is the decision falls back on attributing strategic decision making to the lawyers in the absence of any investigation. So the basic doesn't pinhole to require that because pinholster says I must affirmatively entertain the range of possible reasons. Counsel may have had for proceeding in their investigation as they did. If I think the California Supreme Court's explanation of why counsel did or not develop the mitigation evidence was reasonable, then I have to deny the writ. Because that's what pinholster says they were to do. Pinholster is different than Wiggins. Pinholster is different than Williams. Pinholster is different than Rompilla. Those were cases long before pinholster. Well, long in years, as I'm old in years. But when you get to pinholster, now a court has to entertain the range of possible reasons, which is exactly what California Supreme Court did. I read present law as stated by Harrington versus Richter, which is the sister case of pinholster in terms of this. Well, I was on Harrington, so I know it pretty well, too. But it seems to me that pinholster outlines what a court must do. And then here I am on appeal having to give deference. And if there's nothing in the record to suggest that what the California Supreme Court has said it was reasonable for counsel to do, that they can come up with that reasonable probability, I'm kind of stuck, am I not? Well, you can certainly go back to the California Supreme Court's own construction of the Sixth Amendment predating this case to see what they consider to be reasonable. People versus Frierson in 1979 set aside a death verdict because counsel had failed to investigate mitigating circumstances. There was another case decided in 1980 by the California Supreme Court, a habeas noncapital case, setting forth the obligations of counsel to perform basic investigation. There's a whole string of California Supreme Court cases going back into the 60s outlining cases that the court set forth a standard that I'd be glad and would seek permission to outline for the court in a letter brief, perhaps. But the standards were well established by the time the California Supreme Court decided this case. My worry is that what you're arguing is that you're arguing that I should require defense counsel constitutionally is required to conduct a certain kind of investigation. And it's into certain areas of Andrew's life. And it seems to me when I look at the pinholster, I cannot get there. If I were just looking at Williams or Wiggins or Rompilla, which leave pretty open what I can do and what I can think about and where I can go, and I got pretty well a lot to work with to help you. And the district court had those cases in front of it when it made its decision. Then pinholster came down. And pinholster changed the whole standard. That's my worry. Because I don't think pinholster says that there's counsel or constitutionally required to conduct a certain degree or a certain kind of investigation. No, but I think pinholster in every other case that's been decided by the Supreme Court through Strickland forward indicate that counsel has to conduct some investigation, that they can't just sit by and conduct no investigation, and that the investigation has to be constitutionally adequate. But how is this case distinguishable from Bell and Berger? The case is distinguishable from those cases because I think we have to consider the structure of the statute under which Mr. Andrews was prosecuted. This was a case where when Mr. Andrews went to trial, the jury was instructed in this case that if aggravating factors outweighed mitigating factors in any degree, then the jury shall impose death. Now, that particular instruction was called misleading by the California Supreme Court in this very case. And but it wasn't until 1975 that that instruction got changed in the California system to indicate that a jury had the discretion to not return a death verdict. In other words, this is a mandatory sentencing formula. So under a mandatory sentencing formula, if counsel presents no mitigating evidence, the result is a foregone conclusion. There's going to be a death sentence by virtue of the law that the jury is given. If aggravating outweighs mitigating, you shall impose a sentence of death. So I'm not sure that that statute existed in that form in the other cases. But it is a factor which this court has pointed to as underscoring counsel's ineffectiveness in a system like that. So one thing that distinguishes this case from the others is that counsel was operating under a system in which they had to produce some mitigating evidence or they were going to receive a death sentence. Is that true for Landrigan too? Is that true for Landrigan too, the Landrigan case? Is it true? What you're arguing right now, was that true for the Landrigan case? Did they have the same standard in Landrigan? Yes. I don't believe they did. I think this particular case, at the point in time when it was tried, was fairly unique in that sense that we had this mandatory sentencing formula. And so we have to look at when we talk about the downsides of presenting certain mitigating evidence, we have to look at the other side of the equation, which is if counsel didn't present mitigating, what was the result going to be? The result was going to be, given the aggravation that the government produced here, a death verdict. So counsel had to weigh the statute under which he was operating, and they had to, in those circumstances, at least conduct some basic investigation into the defendant's background and history. Now, the state referee, based on hearing the evidence from the Strickland experts and everybody else, made a factual finding that the kind of evidence that eventually got presented at the reference hearing could have been discovered through routine investigative steps. In other words, there was nothing unusual about the investigation which led to the mitigating evidence, including the evidence regarding the Mount Meigs mitigating evidence. However, then California Supreme Court said so. However, I'm not sure I followed. Well, I'm just trying to say what difference, when you're looking at what the California Supreme Court did, as it understood the professional standards of the counsel at the time and said it's okay. And the problem is the factual record before the California Supreme Court did not justify the conclusions that the California Supreme Court made, because the reality was the counsel did not engage in any strategic decision-making. But if we're entertaining the possibilities, the actual thinking of the counsel is not really relevant. Well, I think it is clearly relevant, because Harrison v. Richter at page 790 says, courts may not indulge post hoc rationalization for counsel's decision-making that contradicts the available evidence of counsel's actions. And that goes to the point you were making, Judge Smith, about pinholster. What is the current standard? The current standard, as I read it, is that if there is a State Supreme Court decision that doesn't explain the reasoning of that decision, then the court should hypothesize reasons for why the Supreme Court is deciding the way they do. However, that does not apply to counsel's tactical actions when counsel states what his actions are based on. But I'm having trouble seeing why the California Supreme Court's reasoning was unreasonable. I mean, we have the evidence we have about the attorney's motivations. One of them passed away, so we don't have any declaration or testimony from him. But the California Supreme Court said, look, there was a lot of bad stuff in the record. Mitigation is in the eye of the beholder. They had a very short ‑‑ the prosecution said basically nothing at the penalty phase. And it was reasonable not to go into these areas. And that doesn't ‑‑ seems to be supported by the record, or at least it's not objectively unreasonable. What's objectively unreasonable about that? Well, it's objectively unreasonable to, first of all, ascribe tactical decision making to the lawyers when there's no evidence that they made the ‑‑ Well, we don't know one way or the other. There's not a contradiction, as perhaps there was in Harrington. I mean, it isn't like the counsel is on record saying, I'm not going to investigate because I'm too lazy. I mean, they did do some investigation. They decided not to put on a mitigation case. And the court said that was reasonable in light of what could have come out had they gone down that road. And that seems to be supported by the record. I don't see why it's not. Well, in light of what could have come out, I think, is where the problem lies. Because, again, we have to look at what the available options were and what the evidence was that could have been produced in rebuttal. It is absolutely incorrect, as counsel said, that there was rebuttal evidence here that Mr. Andrews was a sociopath. The rebuttal evidence said no such thing. The rebuttal evidence by their main subject. Are you talking about what the referee found? Or are you talking about what was known at the time? Because we can't mix and match, right? Well, I think what we're talking about is the Supreme Court's analysis, their hypothetical analysis. Well, if counsel had done this investigation, they could have theoretically not presented it because of the danger of rebuttal. And my point is that if you look at the nature of the rebuttal, first of all, it is not expert testimony that Mr. Andrews was sociopathic. But there was that he escaped from jail, that he shot at the taxi driver, I guess, that he was involved in a felony murder, he held a gun to the hostage's head. I mean, that's all in the record. So regardless of the mental health evidence, that information, I guess, was readily available or was available. Well, first of all, the evidence in the record by the government, by the prosecution, was the circumstances of the crime, three murders. Then they put in the prior conviction. That's all they put in in the penalty phase hearing. Yes. I think the California Supreme Court said, but had the defense counsel put on more and there was plenty of bad stuff to put on, that was what the California Supreme Court concluded. Right. And what I didn't finish saying was that the prosecutor also put in the prior conviction for the robbery in 1977. The taxicab robbery conviction was put into evidence and an escape was put into evidence. So that was the aggravating evidence that got put in regardless of what counsel did in the case. So in that scenario where you have all that aggravation on one side of the scale, it's unreasonable in that circumstance under this mandatory sentencing formula to say, well, I'm better off doing nothing than putting on some very compelling mitigation about the client being sexually assaulted when he was a very young child because of my fear that the government may come back and produce a case where I'm not going to do anything. And so the court concluded that Andrews had antisocial traits. That was something the jury already knew from the aggravating evidence, that he had antisocial traits. There was no downside to a rebuttal psychologist saying, in my opinion, Mr. Andrews had antisocial traits. The key was trying to explain how he got those antisocial traits and what mitigating So in Williams' Supreme Court says, look, there was no downside in putting in the mitigation because he was a pretty good character. He turned himself in and he didn't have much of a bad record. And the court, the California Supreme Court, distinguished that saying here the evidence was much more ambiguous. Do you disagree with that? I do disagree with it because factually there was evidence that he was extremely well-adjusted, even within this dysfunctional prison system. There was evidence that he had saved another inmate's life in the prison system. There was evidence that he was going to adjust well in the future in the confines of a well-run prison system. And there was evidence overall that, unlike the predators in the Alabama prison system, he was not of that type, that he, as the referee said, was more prey than predator. So it was, I think, overall, looking at the mitigation, a case where there are some very powerful themes here, which would have at least given the jury something to balance against the aggravating factors. And in our view, given the strength of this evidence, especially the sexual assault evidence at Mount Meigs and the things that happened to him when he was very young, that that was enough where it could have led, under the prejudice standard, at least one juror to a different weighing of the balance here and could have led to a life sentence. Despite those, what seems to be the serious aggravating nature of this crime, you think that's true? I mean, you've heard the prosecutor. I know you're pretty familiar with the facts. But this crime is pretty heinous. Yes. As are most capital crimes. Now, this one, of course, is three murders. Three murders, a rape. Yes. And then within the murders, a murder of what I would call a good Samaritan. Well, actually, one of our claims here was that Mr. Chisholm was not a good Samaritan but a co-worker in the drug business. But I take your point here, and I think it's important to emphasize that we actually address the question of prejudice empirically in the evidence here because we had testimony from at least two people. One of our Strickland experts tried a case very similar to this case, in fact, more aggravated. It was five or six homicides, including rape. And he put on the exact kind of mitigation that we had here in terms of a segregated juvenile facility destroying the client's life, and he received a life verdict on five murders. We also produced evidence by Dr. Craig Haney, who indicated that of the last ten cases he had worked on involving similar mitigation, that nine of those cases had resulted in life verdicts, and one of those was a quadruple murder and involved one of the victims involving a young child. The reported cases from this circuit all state that mitigation can make a So, yes, the crimes were aggravated. Yes, they were entitled to wait in the balance. But the correct presentation of the kind of mitigation that we're dealing with here can and has made a difference in the vast majority of cases where this kind of evidence has been presented. Don't we have to determine whether the California Supreme Court's determination on this was unreasonable? And you're saying that they were unreasonable? Yes. Let me ask you about some of your uncertified claims. I think it seems like in my review that they suffer a serious challenge on the prejudice prong, mostly because of the palm prints. Is there anything you'd like to talk about with respect to the palm prints? Because it seems like at every turn on your uncertified claims, the palm prints outweigh your arguments. Sure. And I guess my first response is, when we made a Brady claim relating to the palm print evidence, that the government's response in the California Supreme Court was that palm prints were only some evidence of guilt. And the California Supreme Court itself in the direct appeal pointed to the debacle with the palm print evidence as being the reason why the jury hung at the first trial and hung significantly in favor of acquittal as to some of the counts. The kind of palm print evidence that was presented in this case was not your typical strong fingerprint evidence because there was this factual issue that one of the fingerprints examiner had misidentified, according to him, the palm print evidence to begin with. So that was a feature of the first trial where the jury hung. It was also a feature of the second trial where that fact was again brought out that this palm print evidence had been allegedly misidentified by one of the fingerprint examiners. Some of the evidence that didn't get presented, this is on the uncertified claims, had fingerprint evidence from other alleged perpetrators in close proximity to the victim. And that was never presented. So the palm print evidence, and I adopt the government's position, was some evidence of guilt, but it would not have precluded counsel from pursuing the defense that they said they were pursuing, which is reasonable doubt at the guilt phase and lingering doubt in the family phase. Their chosen defense was to put that defense on. And they mentioned in passing that Kevin Davis' fingerprints had been found in this residence. They never even brought out where in the residence. The other perpetrators that we paint a picture of in the briefs also had fingerprints on the premises as well. So it could very well have been argued that, yes, Mr. Andrews' prints were in that apartment, so were Kevin Davis', so were Anthony Chaney's, and there were numerous fingerprints that went unidentified near the victim's body that did not belong to Mr. Andrews. I think I'm out of time. No, you've got four minutes. Oh, I've got four. Okay. One of the issues I wanted to address is the contention that we were claiming that all of this mitigating evidence had to be presented. And that, of course, is not our contention at all. We were tasked in the State Supreme Court of demonstrating what mitigating evidence was available. We did that. That's not to say the counsel who had conducted a reasonable investigation was obligated to present all of it. But certainly the evidence concerning Mount Meigs was powerful. And as the court just recently in the ---- Well, the only way they're going to get to Mount Meigs is through Carl Popolis, right? I don't think that's true. What other way would they have got to it? There I think what we have is ---- I mean, they couldn't go through the family. Couldn't go through the family, but these conditions were well litigated. Well, I understand. I understand they were well litigated, and I understand they went down and did some research. But the problem is, it seems to me reviewing the record, the only place we can really say is Carl Popolis to get them to the evidence. Well, the referee made a factual finding that the evidence could have been gotten to through routine legal research. I know routine. But when he said routine, I started then to think, how were they going to do it? What routine could have been there? Carl Popolis was their chance to get there. Well, Carl Popolis was their chance. And to me, to say, well, the investigators were only told to interview him about guilt phase issues really I think underscores the inadequacy of the investigation because nobody was doing the penalty phase investigation. And here, as you say, they had this person right here in Los Angeles in their own neighborhood who knew Mr. Andrews' background, had been subjected to the same kinds of things he had been subjected to, and would have opened the floodgates to all these other folks as well as to the paper trail here, which was extensive. So let's say he's the way. Then what Supreme Court precedent do I go to to say that it was unreasonable professional assistance for counsel not to contact him? What precedent do I look at based on Penholster when there's nothing in the record about what it was that were the professional standards? The Supreme Court has suggested what happened was certainly professional, all done well within the standard. I'm trying to think about where do I go to the Supreme Court precedent to undo what the California Supreme Court said. That's all I'm trying to help you. I'm looking for the place. Well, I think you start with Strickland. Strickland doesn't do it. And as amplified by Williams. Well, Williams is gone. Frankly, Penholster, in my view, you can put Williams, you can put Wiggins, you can put Rompilla and all the things they said about what I should do when somebody didn't do enough investigation and really focus in on not doing enough. And when it comes to Penholster and I read what they say in Penholster, I have a tough time with those three cases anymore. It says right there the court rejects any constitutional duty to investigate. A reviewing court may affirmatively entertain the range of possible reasons counsel may have had for proceeding as they did, which is exactly what California Supreme Court did. And I think that it is my position that in light of the quote I read to you from Richter that that statement from Penholster applies to a situation where you don't know what counsel's tactical decision making was. Here we do know what counsel's decision making was because we had testimony from Miller and it's also not true that there's nothing in the record from Mr. Lenoir. There is in the record a declaration by him. It's exhibit 178 at the evidentiary hearing which was admitted in evidence and it is at excerpts of record 5799 which talk about his penalty phase investigation. And what he says in that declaration is we were looking for good character and good deeds. That was the focus of their mitigation investigation. And, of course, good deeds and good character are all fine and good, but that's not what mitigation is all about typically. Mitigation is typically about things that happen to the client which are not necessarily good. And in this case something horrible had happened to the client. But to confine your investigation to good deeds and good character is an And that is something that is in the record as to his reasoning. And Mr. Miller, for his part, and his stated rationale was had I known, especially of the racial issues in this case, he said he would have put this evidence on. So this is not a situation as it was in Pinholster. As I understand Pinholster there was not that testimony of here are my tactical justifications. And that explains the statement in Richter which says you cannot engage in post hoc rationalizations that contradict counsel's stated rationale. And that's exactly what the California Supreme Court did here. They made up justifications. They said that the strategy here was to circumscribe Mr. Andrews' background. Nowhere in the record is there any evidence to support that that was a tactical decision by anybody. And of course you cannot have a strategy of circumscribing background unless you know what that background is. And here these lawyers did not know what his background was. So they could not, under the case starting with Strickland and going forward, and even under Pinholster, you cannot have tactical decision making when you do not do the basic investigation which gives you the facts to decide to make reasonable tactics. Now you are over time. Thank you. Thank you. We'll hear from the government. I'd like to address the issue about the prevailing professional norms because it is significant that in this case the Strickland expert, particularly Mr. Gillingham, was not able to articulate clearly any prevailing professional norms at the time of trial in 1984. And in fact, of significance, he admitted that he could not think of a single case where counsel at that time around 1984 looked into, investigated or presented current prison inmates as potential mitigating evidence to show that the defendant on trial at the time had suffered these kinds of conditions, nor could he identify any literature suggesting that counsel do so. And so what we have in the record is that this wasn't the standard for counsel at the time of trial, and the California Supreme Court said that the type of evidence and the length of both sides that was reflected at the hearing was not accurately reflective, and the referee made the same finding of what was done at the time of trial. Rather, presentations were much shorter, more comparable to what actually happened in this case. And so that is a significant admission by Petitioner's Strickland expert. That's why I wasn't asking him to rely on his expert. That is a tough case to overcome if you rely only on the expert. But if you put the ABA standards in, as they did under Ron Pilla, you might have a different story. Potentially. And here, unlike what counsel argued, defense counsel did perform some investigation into mitigating evidence. This is not a case of zero investigation. Even over the petitioner's strenuous objection, counsel went without informing him and interviewed his mother, and as the California Supreme Court found, they not only talked to her about her background, but also his background. Although when they came back, his response was so severe that they decided not to continue. But they did do that, even though he objected to them doing so. They also went to Alabama and got the records regarding his prior convictions. A significant piece of mitigating evidence resulted from that. It showed that Petitioner was not the actual shooter in the prior robbery murder. And they presented that information to the jury. So to rely back on some instruction, and saying that because there's no mitigating evidence, the death penalty was mandated, that not only would not have applied at the time of the trial in this case, even based on the evidence presented in aggravation and mitigation then, but it certainly would not have applied in view of all the mitigating and aggravating evidence that came out at the evidentiary hearing. The California Supreme Court cases that counsel has referenced were mostly general cases setting forth, akin to Strickland, standards that counsel must be diligent in representing the client and diligent in conducting investigations. The Fireson case had to do with choosing between mental defenses. And they found that counsel has to investigate those things before making that choice. That's not an issue in this case. In terms of the references to the prosecutor arguing that Petitioner was a sociopath, that is simply another term for antisocial personality disorder. And there is no question that experts, that Dr. McNeil in particular, testified that Petitioner has that disorder. And even Petitioner's experts, at least two of them, had to admit that he met that criteria and even couched it in the phrases of, of course he did and obviously he did. The fingerprints here. There is no defense expert declaration. There is no evidence whatsoever that the prints found next to Brandon's naked strangled body are not Petitioner's prints. Although there was a mislabeling that occurred, not a misidentification, which I would suggest are different. It wasn't a matter of these prints are so close, we don't know the difference. The three fingerprint experts who later testified said that those prints, even though they were initially mislabeled as Wheeler's, did not resemble Wheeler's palm prints at all. And they all three testified that those prints belonged to the Petitioner. Petitioner has never come forward with any evidence showing that the two prints right next to Brandon's body, on either side of her body, did not belong to him. There is no possible way that he can overcome that for prejudice on any guilt phase claim. Going back to the claim of penalty phase ineffective assistance, even the dissenting justice, who found the mitigating evidence in this case compelling, said that had the Petitioner's counsel discovered and presented all of that mitigating evidence, the jury might still have returned a verdict of death because the three murders Petitioner committed were strong evidence in aggravation. And that doesn't even discuss the aggravating rebuttal evidence. With that, she didn't say that there was no possible way any rational juror could still have imposed the death penalty. What that statement demonstrates is, at a minimum, there was at least room for the majority to disagree with that in a reasonable fashion. I would submit that the District Court judgment granting penalty phase relief should be reversed. Thank you. Okay, the case of Andrews v. Chappelle is submitted and we're adjourned.
judges: Ikuta, Smith, Murguia